**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**IN ADMIRALTY**

**Case No.:**

CERTAIN UNDERWRITERS AT LLOYD'S
OF LONDON SUBSCRIBING TO POLICY
NO. 80901LH1827981000,

        Plaintiff,

v.

BLACK GOLD MARINE, INC.,

        Defendant.                 /

## COMPLAINT FOR DECLARATORY RELIEF

Plaintiff, CERTAIN UNDERWRITERS AT LLOYD'S OF LONDON SUBSCRIBING

TO POLICY NO. 80901LH1827981000 ("Underwriters"), hereby sue Defendant, BLACK GOLD

MARINE, INC. ("Black Gold") for declaratory relief and in support thereof state as follows:

### JURISDICTION AND VENUE

1.     This is an action for declaratory relief pursuant to 28 U.S.C. § 2201.

2.     This is an admiralty and maritime cause within the meaning of FED. R. CIV. P. 9(h),

and this Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1333, as it involves a dispute

regarding a maritime contract. Underwriters invoke the provisions of Rules 9(h), 38(e), and 82 of

the Federal Rules of Civil Procedure.

3.     Venue is proper in the United States District Court for the Southern District of

Florida pursuant to 28 U.S.C. § 1391(b), because the Defendant is a resident of this District.

4.     This Court has specific personal jurisdiction over Black Gold under § 48.193(1)(a),

Fla. Stat., because Black Gold: contracted to insure a person, property, or risk located within the

State of Florida at the time of contracting; operated, conducted, engaged in or carried on a business or business venture in this state; and/or breached a contract in the State of Florida by failing to perform acts required by the contract to be performed in this state, and exercising personal jurisdiction over Black Gold comports with traditional notions of fair play and substantial justice.

5.     This Court has general personal jurisdiction over Black Gold under § 48.193(2), Fla. Stat., because Black Gold engaged in substantial and not isolated activity within the State of Florida, and exercising personal jurisdiction over Black Gold comports with traditional notions of fair play and substantial justice.

6.     All conditions precedent to the filing of this action have occurred, been waived, or otherwise complied with.

7.     Pursuant to the requirements of 28 U.S.C. § 2201 and Article III, Section 2 of the United States Constitution, a case or controversy exists and has existed between the Parties since the beginning of this action, such that an action or declaratory judgment is ripe and appropriate.

## PARTIES

8.     At all times material to this action, Plaintiffs Certain Underwriters at Lloyd's of London severally subscribing, each for its own part and not for any other, to insurance policy no. 80901LH1827981000, are foreign entities authorized to do business in the State of Florida but not domiciled in the State of Florida.

9.     Upon information and belief, Black Gold registered the vessel that is the subject of this action in the British Virgin Islands and contracted to insure a person, property, or risk located within the State of Florida at the time of contracting; operated, conducted, engaged in or carried on a business or business venture in the State of Florida; breached a contract in this state by failing

2

to perform acts required by the contract to be performed in the State of Florida; and/or engaged in substantial and not isolated activity within the State of Florida.

## FACTUAL ALLEGATIONS

10.     In or about October 2017, Black Gold Investments (the parent company of the Defendant) entered into a contract with Midnight Express Power Boats, Inc. ("Midnight Express") (the "Purchase Contract") to purchase a 43' 2017 Midnight Express "tender", hull identification no. EXK43036E718 (the "Vessel").

11.     The Purchase Contract set forth the total cost of the Vessel as $1,296,528.74, and after Midnight Express applied a $265,409.74 factory direct discount, Black Gold purchased the Vessel for $1,031,119.00. A true and correct copy of the Purchase Contract is attached hereto as **Exhibit "A"**.

12.     The Vessel was an extremely high-performance power boat, equipped with four outboard engines of 627 horsepower each, for a total of 2508 horsepower. The engines, which weigh approximately 1200 pounds each, were manufactured by Seven Marine. At full throttle, the Vessel could reach speeds of approximately 90 mph.

13.     It is unclear precisely when delivery of the Vessel occurred, but on May 26, 2017, Harris Glaser, Vice President of Midnight Express, executed a Builder's Certification and First Transfer of Title, U.S. Coast Guard Form CG-1261, evidencing a first sale or transfer of vessel from Midnight Express to "Black Gold Marine, Inc." A true and correct copy of Form CG-1261 is attached hereto as **Exhibit "B"**.

14.     The Vessel was then entered into the British Virgin Island's registry as official number 748025 on July 13, 2017 ("British Registration"). The British Registration indicates the owner of the Vessel as "Black Gold Marine 2 Inc." It also indicates other Vessel particulars,

including four sets of engines and shafts as well as an estimated 65 knots of ship speed. A true and correct copy of the British Registration is attached hereto as **Exhibit "C"**.

15.     Neither the Purchase Contract, Form CG-1261, or the British Registration were ever disclosed to Underwriters at any time prior to Underwriters insuring the Vessel.

16.     On May 23, 2017, Black Gold's agent contacted Underwriters to obtain a hull insurance quote for the Vessel. It was to be added onto an existing policy that Underwriters had issued to Black Gold, insuring Black Gold's 2017 125' Westport Motor Yacht.

17.     In that communication, Black Gold's agent specifically requested a quote for a "2017 43' Midnight express 627 HP value $1,200,000."

18.     Underwriters were never informed that the Vessel actually had *four* 627 HP engines.

19.     On May 25, 2017, a new application was submitted to Underwriters, indicating the "value" of the Vessel as $1,200,000 ("Vessel Application"). A copy of the Vessel Application is attached hereto as **Exhibit "D"**.

20.     The Vessel Application was signed by Black Gold's principal, Blake Ducharme, on May 25, 2017. It represented the titled owner to be Black Gold Marine, Inc. and indicated the date of purchase for the Vessel to have been May 26, 2017. *Id.*

21.     In addition, the Vessel Application represented that there were no claims/losses by the owner and/or captain, no claim history on the Vessel, and left spaces for when the latest survey date and name of surveyor blank. *Id.*

22.     Again, the Purchase Contract for the Vessel was never disclosed to Underwriters, who were unaware that Black Gold paid only $1,031,119.00 for it. No modifications were ever made to the Vessel after Black Gold took possession that would increase its value to $1.2 million.

23.     That policy was ultimately bound and was effective from May 26, 2017 to May 26, 2018 (the "Initial Policy"). Under the Initial Policy, the Vessel was insured for $1,200,000.00.

24.     Almost immediately after Black Gold took delivery, the Vessel began suffering problems.

25.     For example, it was noticed early on that the Vessel's transom was so heavy (on account of the quad engines) that the outboard side of the aft scupper drains sat below the water line, thereby causing the cockpit to fill up with water. It is unclear whether this was ever repaired to the satisfaction of any qualified marine surveyor.

26.     Various other warranty and repair claims included:

     a.     The Vessel's hardtop was replaced in Winter 2018;

     b.     Also in Winter 2018, cracking under the deck near the black water tank was discovered;

     c.     In January 2018, the bow thruster motor vented smoke into the cabin, following which it was discovered that the wiring was not appropriately gauged;

     d.     In April 2018, the dive door on the side of the Vessel was discovered to be leaking water into the bilges while under tow; and

     e.     In Summer 2018, the Black Gold noticed a grinding sound from the steering system, and the entire steering system was replaced later that year, as the steering arm had broken.

27.     Meanwhile, as problems with the Vessel continued to mount, the warranty period neared its expiration, and the renewal period on the Initial Policy approached, Black Gold commissioned a survey of the Vessel.

28.     This survey was conducted by D.A. Pliske and was dated February 27, 2018 (the "First Survey"). A copy of the First Survey is attached hereto as **Exhibit "E"**.

29.     The First Survey, which was conducted while the Vessel was at Midnight Express for repairs, makes several troublesome findings.

30.     It first notes that "this vessel was in for warranty repairs and to rectify certain defects associated with the vessel."

31.     It makes a "general impression" that "[T]he vessel has not been well managed under the care of Midnight Express. The vessel was exceptionally dirty. The bilges and deck lockers were found to be holding rain water."

32.     The First Survey further cataloged eighteen (18) repair items, ranging from relatively minor issues, such as speaker lights not working, to critical issues such as the aforementioned leaking dive door. The repair issues set forth by Midnight Express Service Manager, Dave Brownell, in an email dated February 22, 2018 at 12:03 p.m. to D.A. Pliske are set forth in brackets below followed by comments by the surveyor:

   a.   [Paint defects – see tape] Reported the vessel was "repainted" from the rub rail up. The vessel was in such a state the condition of the paint could not be assessed. The vessel was exceptionally dirty covered in shop dirt and debris. The vessel needs to be completely detailed to first class yacht standards so a fair assessment of the paint finish can be performed.

   b.   [Replacing hardware on radar and flir to painted finish washer] Not done.

   c.   [AIS receive only] Reported the AIS is a Class B receiver only. Does not transmit and receive (class A) Not verified. Not known what was specified on the order sheet or electronics package.

d. [Gen battery goes dead] Reported to been rewired to charge by shore power connection or by engines underway. Not verified functionality of this system. No details provided on how this was done.

e. [Rear hatch does not open properly] Mechanism reworked. "Added a ram". Seat demonstrated. Appears to be working.

f. [Install proper hardware on hatch ram] Reported to have been done. Does not appear to be the case. See list of additional findings below.

g. [Starboard cooler opens underway] Trial run not performed to prove. Static testing indicates that this has not been corrected. Moderate pressure without utilizing the latch mechanism easily disengages the latch and allow the coolers to slide out.

h. [Bar lid rubs on right side] Reported to have been adjusted, repaired and painted. Bar top was covered with gear and moving blanket. Not sighted.

i. [Windshield frams [sic] has stress cracks] Repaired. No cracks visible around perimeter. Note paint finished on frame perimeter were bare and loose in a number of areas.

j. [Flir has scratch on lense [sic]] No scratch identified. Needs clarification.

k. [Tow light needs to be raised] Installed on a painted stanchion.

l. [Starboard refer is lnop] Reported to have replaced switch cable. Not proven.

m. [Install better black water pump] Not done. Argument that the pump works as designed leaving a small amount of black water in the tank. Not proven. Needs clarification.

n. [GPS heading not correct] Reported to have been adjusted. Static heading showed 180. Magnetic compass showed 185.

o. [Paint on the bottom thin] Not done. Argument that this is a "90mph boat and that paint will not last". Paint is certainly thin.

p. [Three speaker lights not working] Rewired. Corrected

q. [Dive door is cracked] Hull side dive door being utilized to access the vessel while repairs underway to the vessel. The door could not be closed to fully inspect.

r. [Install check valves in refer lines] Not done. Check valves installed on deck scupper drains. Need clarification here.

33.    In addition, the First Survey listed an *additional* eighteen (18) findings and comments:

a. Check valves installed on deck scupper drains as the vessel trims by stern excessively. Reported this stern trim is due to the selected engine package. These check valves will likely foul in the open position from trapped debris rendering them ineffective. The correct action would have been to raise the overboard discharges to account for increased stern trim. The vessel should be inspected afloat to determine if there are other possible detrimental effect from this increased stern trim. This can include too low generator exhaust positioning and whether back siphoning is a risk for other discharges such as bilge pumps, bait drains, locker drains etc which can lead to flooding of the hull, the generator or other systems. This is significant concern which can lead to sinking of the vessel and/or damage to generator and/or other systems.

b. Port forward bow bulwark storage locker missing the latch catch.

c. Console windshield trim paint is missing and loose. The perimeter appears to have been improperly prepared to accept a painted finish.

8

d.  There are no threads passing through the starboard outrigger hard top plate nylock nuts. Install proper fasteners with at least 2 threads passing through the nuts.

e.  The air conditioning system went into a high pressure fault during in water trials by Midnight Express. Repairs are scheduled.

f.  Wet weeping cracks around the bow thruster tube fairing in the hull port and starboard. These areas need to be opened up for inspection. Repair and reinforce as needed. Refinish the hull.

g.  The generator shut down during in water trials by Midnight Express. Repairs are scheduled.

h.  The engine controls beep an alarm code. Repairs are scheduled.

i.  The vessel needs to be detail cleaned to address accumulation of dirt and debris.

j.  There is a wet weeping crack in the underside of the aft bench/hatch. This is an indication of water trapped inside the laminate and/or coring materials.

k.  Unfilled screw holes on the underside of the aft bench/hatch.

l.  Trim the protruding through bolts on the aft bench seat ram plate.

m.  The aft bilge fire bottle needs to be certified and tagged.

n.  The lock nuts are not engaged on the aft bench seat ram lift mechanisms.

o.  The under seat cooler hatches will not stay latched.

p.  The starboard under seat cooler has screws placed into the side wall of the cooler through the slide mechanism. The cabinet face plate appears to have been caulked to the cooler end and is warped.

q.  The finish caulking inside the cabin area is poorly executed. It needs to be reefed out and redone.

    r.   The underside of the hard top is dimpled from where the un-bushed fasteners are over tightened and pulled up into the underside. Reinstall these fasteners with proper load spreading plates or bushes. Ideally, the hard top should have been constructed with solid load bearing filler where hardware is through bolted. These fasteners include those for the FLIR, searchlight, radar dome and mast light mount.

34.    The First Survey was not sent to Underwriters prior to the renewal of the Policy.

35.    Several weeks later, Mr. Pliske surveyed the Vessel again, culminating in a survey report dated April 9, 2018 (the "Second Survey"). A copy of the Second Survey is attached hereto as **Exhibit "F"**.

36.    The Second Survey was intended to be read "in conjunction" with the First Survey, and contained an additional *fifty-one* (51) issues in need of repair:

    a.   The black water holding tank discharge pump trips the circuit breaker. It appears that the tank has a venting issue. The pump appears to load up as if it is air bound.

    b.   The partial bulkhead just aft of the bow thruster is cracked through the skin in the upper port corner of the cutout. The bulkhead needs to be repaired and reinforced.

    c.   The limber hole at the bow thruster is closed off. Water is trapped forward of the bow thruster tube.

    d.   The forward deck is separated from the tabbing along the perimeter inside the black water holding tank well aft and forward at the bulkhead and port and starboard at the deck well verticals. This area needs to be ground out and re-fiberglassed. Reinforcements are needed to prevent follow on damage.

e.  The deck liner tabbing is let go and split on the port side and aft forward of the bulkhead aft of the bow thruster drive. This area needs to be ground out, repaired as necessary, and reinforced as needed.

f.  The foredeck table well drains from the deck into the forward bilge. The drain holes are unsealed and the exposed core material was found to be wet.

g.  The bow thruster forward bulkhead shows two areas where it is split and weeping in the very forward section of the bow thruster bilge. Gain access to this area for further inspection, repair as necessary, de-core as needed, reinforce, and refinish.

h.  As a general observation. The hole saw cut outs and other penetrations of the core materials throughout the visible void and bilge spaces are unsealed. The exposed core material is found to be saturated with water in a number of instances. This is poor build practice. All exposed core materials should be sealed against water.

i.  The generator starts and runs but shuts down. The generator is inoperative at this time. The generator needs to be serviced and proven.

j.  The battery bank has a melted cable. The linking cables between batteries appear to be too small in gauge. One of these cables is melted through. Recommend consulting with a qualified marine electrician to determine the cause of this electrical issue and repair as necessary.

k.  The GOST tracker antenna/power box fell off inside the console void. It needs to be remounted. The screws used are too small and do not benefit from reinforcement or backing.

l.  The toilet does not flush properly. None of the flush controls works except the bowl empty control. It is reported that several flushes are needed to empty the bowl. This may also point to a tank venting issue.

m.  The head sink and shower drain into the bilge. This is poor build practice. The sink and shower pan should drain to a sump with automatic pump to overboard.

n.  The toilet slideout mechanism is inoperative. It does not function properly.

o.  The refrigeration compressors are corroded due to the exposure of saltwater from the dive door leak. The compressor should be replaced.

p.  The aft bench seat is chafing in the opening. It does not fit properly.

q.  The dive door leaks seawater through the hinges into the bilge under way and while under tow. The hinges are open to the bilge. The design and execution is poor.

r.  The dive door upper gate section latching mechanism screws fell out. One of these fasteners has wedged itself into the bottom edge of the dive door and caused damage.

s.  The starboard outrigger stowage stand is loose on the hardtop. The fasteners are pulled out. The fasteners do not appear have been installed into any type of backing or insert materials. This is poor build practice.

t.  The port gunnel garbage door does not stay latched.

u.  The XM satellite radio is found to be inoperative.

v.  The aft coolers do not line up or latch properly. Wood screws have been run into the side of the coolers. These screws are pulled out and are loose. The coolers are too small for the rack.

w.  The fish boxes do not pump out properly.

x.  The hardtop shows a significant transverse crack on the forward end of the top running nearly complete across the hardtop. This hardtop needs to be ground opened and inspected. Repair, reinforce and refinish.

y.  The hardtop handrails are loose. The fasteners do not appear to be installed with any type of reinforcement. This is poor build practice.

z.  The port aft swim shower is broken out of the holder. The shower has fallen into the bilge void and is not accessible. The quality of this shower part is poor.

aa. The starboard center trim button is catching and sticking on the main engine control. This could pose a significant safety hazard considering the speed this vessel is capable of. Faulty trim operation could lead to loss of control.

bb. The "all motor trim" control is not synchronized. The engines do not trim together. This could pose a significant safety hazard considering the speed this vessel is capable of. Faulty trim operation could lead to loss of control.

cc. The hinge hardware on the bait boxes is loose. The fasteners are stripped.

dd. The starboard forward cupholder does not drain.

ee. The cupholder, rod holder, and popup cleat drains are not plumbed. A number of these are found to be fit with plugs while a number are found to be open into the bilge and void spaces.

ff.  The forward lounge seats do not drain.

gg.  The scupper drain overboard fittings are missing the rubber check flaps.

hh. The transom door does not latch and water leaks through the door. The door alignment is very poor.

ii.  As a general comment, the hardware installed throughout the vessel appears to have been installed without proper inserts, backing, or securing devices. This is poor build quality. Considering the size of this vessel and speeds it can attain, it would be expected that all the hardware would be installed to a high build standard. That would include utilizing techniques such as threaded inserts, tapped solid lamination, backing plates, washers and/or nuts.

jj.  The forward seat cushions are not secured with snaps.

kk. The starboard bait box does not drain. It appears to stay full to the waterline level.

ll.  The back seat covers have no snaps.

mm.        The aft bar top does not stay latched down under way.

nn. The paint finish is poorly executed. As a general comment, there are numerous fisheyes, curtains, sags, and overspray noted throughout the exterior paint finishes.

oo. The dive bottle rack is too shallow. The bottles do not fit properly.

pp. The box on the hardtop mounted horn is loose.

qq. The tint is deteriorated on the hardtop Plexiglas hatch.

rr.  The misting system does not work properly.

ss.  The cockpit bar sink drains into the bilge. A sump should be installed with automatic pump with discharge overboard.

tt.  The starboard transom live well/cooler compressor unit is found to be inoperative.

uu. The live wells appear to be missing the drain standpipes and/or bottom plug fittings.

vv. The live well supply outpaces the drains. The live wells overflow through the hatches. This is a poor design.

14

ww.     There is a crack in the corner of the swim step "hatch" recess edge. This needs to be ground out, inspected and repaired.

xx.  The starboard forward gunnel locker is missing the gasket. The hatch has chafed the opening.

yy.  The air conditioning system was found to be inoperative.

37.     In all, the First Survey and the Second Survey reference "poor design," "poor build quality," "poor execution," or the like no fewer than ten times.

38.     The Second Survey was received by Black Gold on April 11, 2018.

39.     The Second Survey was not sent to Underwriters prior to the renewal of the Policy.

40.     Notwithstanding the glaring issues raised in the First Survey and the Second Survey, and notwithstanding the Vessel's tortured warranty and repair history, on April 20, 2018, Black Gold represented to Underwriters, through its agent in soliciting a renewal quotation, that "The client has advised that there have been no changes" with respect to the Vessel. A true and correct copy of the Apr. 20, 2018 email is attached hereto as **Exhibit "G"**.

41.     In light of the above, this representation was false and contained a number of material omissions.

42.     On April 23, 2018, Underwriters offered renewal terms "based on there being no material changes to the risk and no claims for the expiring policy period." A true and correct copy of the Apr. 23, 2018 email is attached hereto as **Exhibit "H"**.

43.     Black Gold accepted the renewal terms, and Underwriters issued the Renewal Policy, policy no. 80901LH1827981000, with effective dates of May 26, 2018 to May 26, 2019 ("Renewal Policy"). A copy of the Renewal Policy is attached hereto as **Exhibit "I"**.

44.     The Renewal Policy generally provides all-risk hull coverage to the Vessel in the amount of $1.2 million, subject to the terms, limitations, and exclusions under the Policy.

45.     The Renewal Policy provides that the Vessel is to be moored in Florida.

46.     The Renewal Policy expressly notes "None advised" with respect to "Claims History."

47.     The Renewal Policy, p. 9, also contains the following relevant provision:

> **Concealment, Misrepresentation or Fraud**
> The entire policy will be void if the insured or their representative conceals or misrepresents any material fact or circumstances, or if the insured's risk has been materially increased, or in the case of fraud or false swearing by the insured relating to this insurance or insurance application whether before or after a loss.

48.     On or about May 3, 2019, Black Gold's principal, Blake Ducharme, was operating the Vessel near Grand Cayman with six guests and a dog on board when Mr. Ducharme reported losing control of the Vessel (the "Incident"). Before Ducharme could react, the Vessel flipped to starboard and landed upside down in the water. All of the occupants of the Vessel ended up in the water and were rescued by other boats in the vicinity.

49.     The Incident resulted in, among other things, a large crack on the starboard side of the Vessel running over a third of its length.

50.     Fortunately, no one was reported to be injured. However, the Vessel has reportedly been significantly damaged.

51.     Underwriters were notified of the Incident on May 7, 2019, and immediately commenced an investigation into its cause.

52.     A surveyor, Michael Pickthorne, was first appointed on May 10, 2019.

53.     The survey took place on May 16, 2019 at the Harbour House Marina in the Cayman Islands to which the Vessel was towed.

16

54.     Subsequently, on June 5, 2019, Underwriters sent another surveyor to the Cayman Islands, Scott Armstrong, to investigate the cause of the loss.

55.     On June 12, 2019, Underwriters, understanding the Incident could result in a covered loss, sent letters to various parties potentially involved in the Incident, advising them of an additional inspection to take place in the Cayman Islands on July 2, 2019.

56.     That same day, Underwriters sent a Reservation of Rights to Black Gold, informing Black Gold that they were "presently evaluating the cause of the loss to ensure that coverage for this loss exists and to identify potentially culpable parties." They also requested various documents to aid in their investigation, as well as an examination under oath. A copy of the Reservation of Rights is attached hereto as **Exhibit "J"**.

57.     A week later, on June 17, 2019, Underwriters received the first documents from the Vessel's captain, Greg Gaus. However, not all of the documents requested were produced.

58.     Over the next several weeks, there were several phone conferences between the office of the undersigned counsel and Mr. Ducharme and Captain Gaus, as well as the various insurance agents and brokers representing Black Gold regarding the status of the claim, in which additional document requests were made.

59.     Ultimately, a second inspection of the Vessel was made on July 2, 2019, wherein Underwriters' appointed surveyor, Scott Armstrong, and naval architect, Peter Gimpel, inspected the Vessel again in order to help identify a cause of loss.

60.     Based on these initial inspections and surveys and without the benefit of further testing to date, it is Underwriters' preliminary understanding that a hydraulic steering hose becoming disconnected from the steering ram, followed by a failure of a fastener attached to the steering arms, may have caused or contributed to the Incident.

61.     On July 10, 2019, Underwriters sent an additional document request to Black Gold, and further requested an examination under oath of Captain Gregory Gaus.

62.     After Mr. Ducharme expressed concern at this letter, counsel for Underwriters sent another email on July 11, 2019, advising that Underwriters were still awaiting receipt of certain documents or confirmation that such documents did not exist, as well as a date for the examination under oath of Captain Gaus.

63.     On July 13, Captain Gaus responded to the most recent document request with additional information. Counsel for Underwriters followed up seeking clarification of certain responses on July 15, 2019.

64.     Ultimately, Captain Gaus sat for an examination under oath on July 22, 2019, where he admitted, *inter alia*, that the First Survey existed and that he had not produced it to date.

65.     In that examination, Captain Gaus also painted a complete picture of the Vessel and the substantial issues that it had been facing leading up until the Incident and prior to the inception of the Renewal Policy.

66.     On July 30, 2019, counsel for Underwriters sent another email to Mr. Ducharme advising him of certain outstanding documents that were promised at Captain Gaus' examination, including the Second Survey.

67.     On July 31, 2019, the Second Survey was finally produced.

### COUNT I – UBERRIMAE FIDEI

68.     Underwriters restates and realleges the allegations contained in paragraphs 1-67 above as if more fully reinstated herein.

69.     For hundreds of years, policies of marine insurance have been subject to the well-entrenched doctrine of *uberrimae fidei*, the duty of utmost good faith.

70.     This duty requires that an insured fully and voluntarily disclose to the insurer all facts material to a calculation of insurance risk.

71.     This duty to disclose extends even to material facts that are not specifically inquired into by the insurer.

72.     The instant Renewal Policy, as one of marine insurance, is governed by the principal of *uberrimae fidei*, whether under federal maritime law or, alternatively, under New York law, which governs the Renewal Policy to the extent there is no well-entrenched federal precedent governing a particular issue.

73.     When seeking to renew the policy, Black Gold omitted, misrepresented, and/or concealed a number of material facts, including, but not limited to:

    a.     The purchase price of the Vessel;

    b.     The claims history of the Vessel;

    c.     The loss history of the Vessel;

    d.     The existence of each and every issue identified in the First and Second surveys and set forth in detail in paragraphs 31(a) through (r), 32(a) through (r) and 35(a) through (yy) above;

    e.     The existence of two surveys of the Vessel, issued mere weeks before the policy renewed, that were highly critical of the build quality and a number of important safety factors;

    f.     The fact that the Vessel had been submitted for numerous warranty claims to both the Vessel's hull and engine manufacturer;

    g.     The fact that the Vessel had four engines of 627 horsepower each, rather than a single 627 horsepower engine; and/or

19

h.      The fact that the Vessel was unseaworthy.

74.     Underwriters would not have issued the Policy, would not have issued it at the same premium, or would not have issued it on the same terms and/or conditions, had it known any one or any combination of the facts regarding the Vessel's history as set forth above.

75.     Therefore, Black Gold breached the duty of *uberrimae fidei*, rendering the Policy void from its inception.

WHEREFORE, Underwriters respectfully request this Honorable Court to adjudge and declare that:

a.      Black Gold misrepresented, concealed, or omitted facts material to the underwriting of the risk;

b.      That such misrepresentation, concealment, or omission constituted a breach of Black Gold's duty of utmost good faith;

c.      The aforementioned breach of the duty of utmost good faith renders the Renewal Policy void *ab initio*; and

d.      Grant any and other such relief this Honorable Court deems just and appropriate under the circumstances.

## COUNT II – BREACH OF CONTRACT

76.     Underwriters restates and realleges the allegations contained in paragraphs 1-67 above as if more fully reinstated herein.

77.     The Policy provides, *inter alia*, that "The entire policy will be void if the insured or their representative conceals or misrepresents any material fact or circumstances, or if the insured's risk has been materially increased, or in the case of fraud or false swearing by the insured relating to this insurance or insurance application whether before or after a loss."

78.     When seeking to renew the policy, Black Gold omitted, misrepresented, or concealed a number of material facts, including, but not limited to:

        a.      The purchase price of the Vessel;

        b.      The claims history of the Vessel;

        c.      The loss history of the Vessel;

        d.      The existence of each and every issue identified in the First and Second surveys and set forth in detail in paragraphs 31(a) through (r), 32(a) through (r) and 35(a) through (yy) above;

        e.      The existence of two surveys of the Vessel, issued mere weeks before the policy renewed, that were highly critical of the build quality and a number of important safety factors;

        f.      The fact that the Vessel had been submitted for numerous warranty claims to both the Vessel's hull and engine manufacturer;

        g.      The fact that the Vessel had four engines of 627 horsepower each, rather than a single 627 horsepower engine; and/or

        h.      The fact that the Vessel was unseaworthy.

79.     Underwriters would not have issued the Policy, would not have issued it at the same premium, or would not have issued it on the same terms and/or conditions, had it known any one or any combination of the facts regarding the Vessel's history as set forth above.

80.     Therefore, because Black Gold failed to disclosed the Vessel's history as set forth above, which was both known to Black Gold and material to the acceptance of the risk insured by Underwriters, Black Gold violated the terms and conditions of the Renewal Policy.

81.     As such, the policy is void *ab initio* and there is no coverage for the subject loss.

WHEREFORE, Underwriters respectfully request this Honorable Court to adjudge and declare that:

    a.    Black Gold misrepresented, concealed, or omitted facts material to the underwriting of the risk;

    b.    That such misrepresentation, concealment, or omission constituted a breach of the Renewal Policy's terms and conditions;

    c.    The breach renders Renewal Policy void *ab initio*; and

    d.    Grant any other relief this Honorable Court deems just and appropriate.

## COUNT III – ABSOLUTE WARRANTY OF SEAWORTHINESS

82.    Underwriters restates and realleges the allegations contained in paragraphs 1-67 above as if more fully reinstated herein.

83.    Under the general maritime law of the United States, there is implied in every policy of marine insurance an absolute warranty that the vessel will be seaworthy at the inception of the risk.

84.    The Vessel was unseaworthy due to, *inter alia*, the combination of factors set forth above.

85.    The aforementioned condition(s) existed at the inception of the Renewal Policy.

86.    Accordingly, Black Gold breached the absolute warranty of seaworthiness implied in the Renewal Policy which renders the Renewal Policy void.

WHEREFORE, Underwriters respectfully request this Honorable Court to adjudge and declare the following:

    a.    The Vessel was unseaworthy as of May 26, 2018;

    b.    The Vessel was unseaworthy as of May 3, 2019;

c.      There is no coverage afforded by the Policy and is void *ab initio*;

d.      The loss and/or damage to the Vessel is excluded from coverage under the implied absolute warranty of seaworthiness under the general maritime law; and

e.      Grant any other relief this Honorable Court may deem just and proper.

Dated: August 27, 2019.

Respectfully submitted,

**DAVANT LAW, P.A.**
*Attorneys for Underwriters*
401 East Las Olas Blvd, Suite 1400
Fort Lauderdale, FL  33301
Telephone: (954) 414-0400
Facsimile:  (954) 332-3301

By:___/s/ *Charles S. Davant*_____
        Charles S. Davant
        Florida Bar No. 15178
        csd@davantlaw.com
        Aaron M. Dmiszewicki
        Florida Bar No. 111455
        amd@davantlaw.com